*Formatted for Electronic Distribution*                                  *For Publication*

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF VERMONT

_____

In re:

    Michael F. Montagne,                              Chapter 12 Case
          Debtor.                              # 08-10916

_____

Bourdeau Brothers, Inc.,


        Plaintiff,

      v.                                            Adversary Proceeding
Michael F. Montagne, Diane Montagne,                     # 08-1024
and Montagne Heifers, Inc.,
          Defendants.

_____

Appearances:  James W. Spink, Esq.                      John R. Harrington, Esq.
              Mary N. Peterson, Esq.                    For Michael F. Montagne
              George E. Spear, II, Esq.
              For Bourdeau Brothers, Inc.               Lisa Chalidze, Esq.
                                                        For Diane Montagne

                                                        Tavian M. Mayer, Esq.
                                                        For the Chapter 12 Trustee


<u>**MEMORANDUM OF DECISION**</u>
**<u>GRANTING JUDGMENT IN FAVOR OF PLAINTIFF BOURDEAU BROTHERS, INC.
AGAINST DEFENDANTS MICHAEL F. MONTAGNE AND DIANE MONTAGNE,
DENYING JUDGMENT AGAINST DEFENDANT MONTAGNE HEIFERS, INC.,
OVERRULING OBJECTIONS TO CLAIM, AND DENYING MOTION TO DISMISS</u>**


      On April 27, 2009, Bourdeau Brothers, Inc. ("BBI") filed a second amended complaint (doc. #

263)[1] seeking payment for feed, grain, and other farm supplies sold to Michael F. Montagne (the

"Debtor"), Diane Montagne ("Mrs. Montagne") (collectively, the "Montagnes"), and Montagne Heifers,

Inc. ("MHI") (collectively, the "Defendants") for use in their farming operations on four open accounts

(Counts I, II, and III), and seeking judgment in the alternative on a claim for unjust enrichment based

---

[1] All document numbers refer to AP # 08-1024 unless otherwise noted.

1

upon the benefit conferred by BBI's delivery, and the Defendants' use, of said goods in connection with the Defendants' dairy farm operations (Count IV). Mrs. Montagne filed an answer on May 5, 2009, in which she asserted fifteen affirmative defenses and interposed eight counterclaims against BBI (doc. # 268). On May 7, 2009, the Debtor filed an answer asserting sixteen affirmative defenses and interposing seven counterclaims against BBI, including an objection to claim (doc. # 270).[2] The Chapter 12 Trustee (the "Trustee") filed an objection to the allowance of BBI's proof of claim, Claim # 23 (# 08-10916, doc. # 175).[3] The Court conducted a trial on the complaint, objection to claim, answers, counterclaims, and affirmative defenses on February 16, 2010.

On March 8, 2010, the Montagnes filed post-trial motions to dismiss pursuant to Federal Rule of Civil Procedure 52(c), as made applicable by Federal Rule of Bankruptcy Procedure 7052 (doc. ## 358, 359). The parties presented oral arguments on the motions to dismiss on March 23, 2010, at which time the Debtor withdrew his motion to dismiss.

Based upon the entire record, including the pleadings filed, the evidence and arguments presented at the trial, and all post-trial oral arguments and briefing, and for the reasons set forth below, judgment in favor of BBI is granted against the Montagnes on BBI's claim for recovery on the open accounts, denied against MHI, and denied on BBI's claim for unjust enrichment, the objections to Claim # 23 are overruled, and the motion to dismiss is denied.

### JURISDICTION AND RELEVANT LAW

This Court has jurisdiction over this adversary proceeding and the Trustee's objection to claim pursuant to 28 U.S.C. §§ 1334 and 157(b)(2)(B) and (C), and the parties' stipulation to this Court's entry of a final judgment on the causes of action relating to this title 11 case (doc. # 205, pp. 2–3). State law must guide this Court's analysis and determination of the issues relating to state law causes of action. See Butner v. United States, 440 U.S. 48, 54 (1979).

### FACTUAL AND PROCEDURAL BACKGROUND

The Debtor and Mrs. Montagne purchased a dairy farm in 1978. A few years later, BBI began supplying fertilizer, seed, and grain for use on the farm. Over approximately twenty-five years, the relationship between BBI and the Montagnes grew to encompass additional farm properties. In December

---

[2] The Court assumes the parties' familiarity with the disposition of all interim procedural issues and motions in this adversary proceeding.

[3] On March 8, 2010, the Trustee filed a memorandum in support of his objection to BBI's claim (# 08-10916, doc. # 187). BBI filed its opposition to the Trustee's objection on March 15, 2010 (# 08-10916, doc. # 188). On March 19, 2010, the Trustee filed a reply in support of his objection to BBI's claim (# 08-10916, doc. # 192).

2007, shortly after a failed attempt at refinancing, BBI commenced an action against the Montagnes in state court.  On October 2, 2008, the Debtor sought protection under Chapter 12 of the Bankruptcy Code, and filed a notice of removal of the BBI state court lawsuit to this Court (doc. ## 1, 10).  On February 6, 2009, BBI filed a proof of claim in the Debtor's bankruptcy case (# 08-10916, Claim # 23), asserting a claim for goods delivered in the amount of $1,024,436.80, including interest in the amount of $280,631.75.  In support of its claim, BBI attached the last page of ledger cards related to four open accounts.

DISCUSSION

The Court will first consider BBI's cause of action seeking recovery of amounts due on four open accounts, referred to as Account # 203, Account # 204, Account # 205, and the Fertilizer Account.  The Fertilizer Account is an account associated with Account ## 203 and 205, and along with Account # 203, forms the basis for Count III of BBI's second amended complaint (doc. # 263 ¶¶ 16–23).  The Court notes that at trial, the Debtor and Mrs. Montagne stipulated to the principal and pre-judgment interest due upon the Fertilizer Account, while preserving the right to object to post-petition interest.  (Trial Tr. 18:16-20:25, February 16, 2010.)  Accordingly, the Court will only address the Fertilizer Account in its discussion on recovery of interest on the open accounts (see § II, infra).

## I.      BBI is Entitled to Recovery of Amounts Due on Open Accounts

The salient facts surrounding the parties' relationship are not disputed.  BBI is a supplier of seed, fertilizer, and grain in northern Vermont and northern New York.  (Trial Tr. 4:7–8.)  In the early- to mid-1980s, BBI established a business relationship with the Montagnes that lasted approximately twenty-five years.  (Trial Tr. 5:2–7, 117:24–118:5, 119:2–120:6.)  Initially, the Montagnes co-owned and operated a home farm, but they later acquired and operated a parcel known as the Bourbeau farm.  (Trial Tr. 80:11–14.)  During the course of their business relationship, BBI delivered goods to the Montagnes at both the home farm and the Bourbeau farm.  (Trial Tr. 16:9–14.)  BBI considered the Debtor and Mrs. Montagne to be the customers on the three open accounts at issue.  (Trial Tr. 5:5–7, 6:7–17.)

Remi Bourdeau ("Mr. Bourdeau"), co-owner of BBI, provided credible testimony at trial regarding the establishment of the three open accounts and the evolution of the accounts over time.  Initially, BBI did business with the Montagnes through an open account.  The Debtor executed two promissory notes related to this account.  (Trial Tr. 44:17–20.)  After the balance due on the notes was paid, BBI continued to deliver goods to the Montagnes until 2004 under Account # 205.  (Trial Tr. 27:19–25.)  Account # 205 was utilized by the parties as an open account from 1996 through 2007 for goods BBI sold and delivered to the Montagnes at their home farm.  (Trial Tr. 25:9–10.)  The last charge for products

3

against Account # 205 occurred in August 2004, and the balance due subsequently increased only because of the accumulation of interest. (Trial Tr. 27:19–23; Pl.'s Ex. 5, Bour584.)[4]  BBI claims a principal amount due of $27,315.89 on Account # 205.[5]  Account # 203, the second open account, was open from 2004 through 2007, and essentially replaced Account # 205.  BBI opened Account # 203 for the Montagnes following a meeting at which the Debtor requested that no additional charges be made to Account # 205. (Trial Tr. 29:17–30:7, 125:1–9.)  BBI claims a principal amount due of $568,442.33 on Account # 203.  Account # 204, the third open account, was open from 2001 through 2007, and was an open account for goods BBI sold and delivered to the Montagnes at the Bourbeau farm.  BBI claims a principal amount due of $73,160.60 on Account # 204.

### A.      BBI has Established its <u>Prima</u> <u>Facie</u> Case

Generally, an open account is defined as: "1. An unpaid or unsettled account.  2. An account that is left open for ongoing debit and credit entries by two parties and that has a fluctuating balance until either party finds it convenient to settle and close, at which time there is a single liability." <u>Black's Law Dictionary</u>, account (8th ed. 2004).  To establish the elements of a cause of action based on an open account, a plaintiff must prove "that there was a sale and delivery of merchandise, that the prices were charged in accordance with an agreement or, in absence of an agreement, were usual, customary, and reasonable prices for merchandise, and that the account was not paid." 1 Am. Jur. 2d <u>Accounts and Accounting</u> § 8 (2010).  As an action on open account is based in contract, the plaintiff's burden of persuasion is a preponderance of the evidence.  <u>See</u> <u>Lewis v. Cohen</u>, 157 Vt. 564, 571, 603 A.2d 352, 355 (Vt. 1991).  "Ordinarily, an account is proved by proving each item, including the date, the correctness of each item contained in the account, the charge made, and the reasonableness of that charge, although this does not mean that, in order to support a suit on open account, each individual item must be specifically proved." 1 <u>Am. Jur. 2d. Accounts and Accounting</u> § 17 (2010).  A creditor need not "prove the actual delivery of each item" in order to establish a <u>prima</u> <u>facie</u> case.  <u>Gardner & Beebon Co. v. Cooke</u>, 513 P.2d 758, 760 (Or. 1973) (quotation and citation omitted), and may rely upon oral testimony.  <u>Amer. Sec. Serv., Inc. v. Baumann</u>, 289 N.E.2d 373, 378 (Ohio Ct. App. 1972).  Therefore, BBI must prove, by a preponderance of the evidence, the following elements to establish its <u>prima</u> <u>facie</u> case: (1) it sold and

---

[4] The invoice for the last charge, dated August 9, 2004, includes a notation that BBI actually delivered the products listed on that invoice on April 14, 2004.

[5] With respect to the claimed amounts due, the Court relies upon BBI's Claim # 23, which attaches the last pages of BBI's ledger cards for Account ## 203, 204, and 205.  The Court also relies upon the breakdown of principal and interest claimed as stated in the Debtor's motion to dismiss (doc. # 359, p. 1, n.1 and p.2, n.2).

delivered the goods to the Defendants; (2) its charges were reasonable; and (3) the balance the Defendants owe is unpaid.

> 1.    BBI Sold and Delivered the Goods to the Montagnes

A manager or supervisor with overall supervision of a business and knowledge of its routines may give competent testimony regarding delivery of goods.  Gardner, 513 P.2d at 760 (finding that general testimony that goods represented by ledger entries were delivered is sufficient evidence of delivery and that specific delivery need not be proven where the business is large enough to make this an impossibility); see also Natchez Elec. & Supply Co., Inc. v. Johnson, 968 So.2d 358, 361 (Miss. 2007) (finding that testimony by branch manager concerning different methods of delivery and billing set forth the standard of practice in conducting business and was sufficient to establish prima facie case for open account debt); but see Evans v. Delro Indus., Inc., 509 So.2d 1262, 1263-64 (Fl. Dist. Ct. App. 1987) (finding that the plaintiff failed to prove delivery by introducing general testimony as to delivery and invoice practices but not introducing specific, affirmative testimony that goods were delivered or actually received).

BBI elicited testimony from its former and current employees, as well as from Mr. Bourdeau, the Debtor, and Mrs. Montagne, regarding BBI's sale and delivery process.  This testimony established that BBI delivered some goods pursuant to an automatic delivery schedule (Trial Tr. 16:15–17:1), and that BBI delivered other goods in response to an order placed by someone at the farm.  (Id.)  Both the Debtor and Mrs. Montagne placed orders directly with BBI on occasion.  (Trial Tr. 94:9–14, 121:1–6, 131:9–14.)  Mr. Bourdeau testified that invoices accompanied each BBI delivery, but that the invoices were only signed when someone was present to sign.  (Trial Tr. 17:10–18:14, 81:19-23, 121:7-10.)  Both the Debtor and Mrs. Montagne testified that they received invoices.  (Trial Tr. 81:19–82:13; 124:12–15.)  The Court admitted into evidence one invoice for Account #203 and multiple invoices for Account ## 204 and 205.  (Pl.'s Ex. 5.)  The Court also admitted into evidence BBI's ledger cards for Account ## 203, 204, and 205 (Pl.'s Exs. 2, 3, 4), which document transactions spanning the period from when each account was opened until the later of either the date it was closed (Account # 205) or the date the Debtor filed for Chapter 12 relief (Account ## 203 and 204).  Mr. Bourdeau testified that the ledger cards accurately reflect all additions, charges, orders, payments, and account balances.  (Trial Tr. 26:3–17.)

While the Debtor cited Evans, the Court finds the rationale in Gardner and Natchez more compelling.  Therefore, the Court finds that BBI presented credible, competent, and persuasive testimony regarding its sale and delivery practices.  Accordingly, BBI has established the first element of its open account prima facie case, i.e., that BBI sold and delivered the goods to the Montagnes.

2.    <u>BBI's Charges were Reasonable</u>

The parties point to no relevant legal authority for determining the reasonableness of BBI's charges, and the Court considers this factor to be a factual determination. Therefore, the Court's analysis focuses on the testimony and documents introduced at trial.

The Debtor testified that BBI was not the only supplier from which he bought goods to supply his farming operations (Trial Tr. 119:2–120:6), which is indicative of a practice of monitoring prices and shopping around. Additionally, the Debtor negotiated price discounts with suppliers, including BBI. (Trial Tr. 125:20–126:7, 145:6–13.) Mr. Bourdeau testified that BBI sent monthly statements and yearly reconciliations to the Montagnes (Trial Tr. 38:20–23), although BBI did not introduce the statements or reconciliations into evidence. Mrs. Montagne acknowledged receipt of the monthly statements. (Trial Tr. 89:18–20.) The Montagnes testified that they occasionally discovered small problems with BBI's charges, but that BBI always resolved their complaints quickly and to their satisfaction. (Trial Tr. 91:10–22, 142:14–143:13.) The ledger cards reflect that the Montagnes made regular, periodic payments on the accounts. (Pl.'s Exs. 2, 3, 4.)

Taking into account the Debtor's practice of buying from a number of suppliers, his negotiation of price discounts, the Montagnes' acknowledgement that they received monthly and yearly statements, the Montagnes' payment of BBI charges for more than twenty years, the consensual resolution of minor disputes concerning charges, and the lack of any evidence in the record that the Montagnes ever disputed the reasonableness of outstanding charges, the Court finds that BBI has established the second element of its open account <u>prima facie</u> case, <u>i.e.</u>, that the prices it charged the Montagnes for the goods it sold and delivered to them were objectively reasonable.

3.    <u>The Balance Owed on the Open Accounts is Unpaid</u>

The ledger cards and testimony presented consistently affirmed that the Montagnes' debt on the open accounts remains unpaid, and neither the Debtor nor Mrs. Montagne introduced any evidence to the contrary. The Court finds that BBI has established the third and final element of its open account <u>prima facie</u> case, <u>i.e.</u>, that the balance owed on the open accounts is unpaid. Accordingly, the Court finds that BBI has established its <u>prima facie</u> case against the Montagnes based on the combination of credible testimony and admitted documentary evidence. BBI failed to present evidence or argument at trial regarding its <u>prima facie</u> case against MHI. Accordingly, with respect to BBI's claims against MHI, the Court will deny BBI judgment for failure to prosecute.

**B.      The Montagnes have Failed to Rebut BBI's <u>Prima</u> <u>Facie</u> Case**

Once the plaintiff establishes its <u>prima facie</u> case, the burden shifts to the defendant to overcome the <u>prima facie</u> case by countervailing evidence.  <u>Pacific Lumber Agency v. Nat'l Aircraft Materials Corp.</u>, 108 Vt. 10, 15, 182 A. 192, 194 (Vt. 1936); <u>see also</u> 1 Am. Jur. 2d. <u>Accounts and Accounting</u> § 17. This may be done by disproving the existence of the account or showing that the amount claimed is incorrect.  <u>Gardner</u>, 513 P.2d at 760; <u>see also</u> 1 Am. Jur. 2d. <u>Accounts and Accounting</u> § 17; <u>Natchez</u>, 968 So.2d at 361; <u>Hautly Cheese Co. v. Wine Brokers, Inc.</u>, 706 S.W.2d 920, 922 (Mo. Ct. App. 1986); <u>Cardinal Wholesale Supply Inc. v. Rainbow Floor Covering, Inc.</u>, 432 So.2d 419, 421 (La. Ct. App. 1983).  The burden of proving an affirmative defense falls upon the party who relies upon that defense. <u>Natchez</u>, 968 So.2d at 361.  Affirmative defenses based on general statements are insufficient; rather, the defendant must set out facts showing a plausible ground for defense.  <u>Accord Farmers Coop,, Inc. v. Levine</u>, 36 A.D.2d 656, 657 (N.Y. App. Div. 1971).

Having found that BBI has established its <u>prima facie</u> case, the Court will next consider whether the defenses asserted and evidence presented by the Montagnes are sufficient to overcome BBI's <u>prima facie</u> case.[6]  The Court will first address Account ## 205 and 203, which relate to the home farm, before turning to Account # 204, which relates to the Bourbeau farm.  The Montagnes asserted many defenses globally as to all three accounts, and those defenses will be addressed in the Court's discussion of Account #203.

        1.      Account # 205

The Debtor argues that BBI may not recover on Account # 205 because BBI failed to produce a promissory note on the account.[7]

The taking of a note on an open account balance may create an "account stated," which is "broadly defined as an agreement, based on the prior transactions between the parties to an open account, that the items of the account are true and that the balance struck is due and owing from one party to another."  1 Am. Jur. 2d <u>Accounts and Accounting</u> § 26 (2010).  "In order to establish an account stated, there must be: (1) a showing of mutual assent, between the parties to the account, as to the correct balance; (2) a

---

[6] To the extent that the Court does not address certain affirmative defenses or counterclaims herein, it is because they have been waived where no evidence was presented on them at trial.  Pursuant to this Court's prior orders (doc. ## 318 and 332), the Debtor and Mrs. Montagne each retain the ability to present proof of their homestead exemption rights if BBI obtains a judgment against them and seeks to enforce the judgment against property they claim to be property protected by the homestead exemption.

[7] Mrs. Montagne has adopted the Debtor's arguments in defense of BBI's claim (<u>see</u> doc. # 358, p. 15).  Accordingly, any discussion and resolution of the Debtor's arguments apply equally to Mrs. Montagne.

promise by one of the parties to pay that balance; and (3) a previous debtor-creditor relationship between the parties." Id. An account stated does not discharge the old debt, and does not bar an action on the debt in its original form. Id.; see also Boone v. General Shoe Corp., 219 Ark. 340, 344 (finding that the taking of a note does not extinguish an open account, a note is not considered to be payment of the original debt unless it is agreed as such by the parties, and a creditor must choose whether to proceed on the note or on the open account); Meagher v. Kavli, 251 Minn. 477, 484–88, 88 N.W.2d 871, 877–79 (Minn. 1958) (recognizing the difference between an account stated and an action on a running account and noting that a creditor may state alternative grounds for relief). Where a creditor accepts a negotiable promissory note in liquidation of an open account, the creditor "cannot recover in a suit upon the original cause of action unless, upon the trial, he produces the note or satisfactorily [accounts] for its absence." Boone, 219 Ark. at 344.

Mr. Bourdeau testified that after the Montagnes paid the two 1995 promissory notes associated with Account # 205, BBI continued to sell goods to the Montagnes under Account # 205 until May 2004. (Trial Tr. 44:12–20.) At that time, the parties negotiated the opening of Account # 203 as the new account for deliveries to the home farm, and BBI ceased adding charges to Account # 205 (save for one delivery in August 2004) and posted only interest charges thereafter. (Trial Tr. p. 25:15–29:25.) The Debtor repeatedly testified that he thought he signed a new note for Account # 205 in 2004 in order to document a negotiated lower interest rate for Account # 205 and to secure price discounts on Account # 203. (Trial Tr. 125:3–126:17, 133:7–11, 145:16–22.) Entries on the Account # 205 ledger cards beginning in 2005 include, for the first time, a "note account" designation.[8] Notwithstanding assertions to the contrary in post-trial briefs, Mr. Bourdeau never affirmatively testified that the parties did not execute a new note in 2004. By contrast, the Debtor did testify as to this issue. At trial, BBI's counsel questioned the Debtor as follows:

Q      So when Remi Bourdeau testifies that there was no Promissory Note in 2004, you
       can't deny that he is right about that; right?
A      I would say he has a better memory than me.

(Trial Tr. 126:14–17.) BBI asserts that Mr. Bourdeau testified that there was no new note (see doc. # 363, pp. 6, 20). However, BBI does not cite, and the Court is unable to find, any place in the record where Mr. Bourdeau actually gave this testimony. Thus, the Court is left only with the Debtor's tentative testimony (cited above) that he thinks he remembers executing a new note for Account # 205.

---

[8] The Account # 205 ledger cards also show the negotiated reduced interest rate beginning with a 2004 ledger card. The Account # 205 ledger cards contain either the interest or the note designation until 2006, at which time both the lower interest rate and the "note acct" designation are seen on the ledger cards.

Pursuant to the law of open accounts, even assuming the existence of a new note in 2004, BBI may recover under either an open account theory or an account stated theory.  See Boone, 219 Ark. At 344.  Neither the Debtor nor Mrs. Montagne produced the note or testified as to the nature of its negotiability.  Without such evidence, BBI is entitled to pursue its claim as an action on open account.

The Montagnes fail to offer any specific defense to their liability on Account # 205, other than the possible existence as a note.  Accordingly, the Court finds that the Montagnes have failed to rebut BBI's prima facie case as to Account # 205.

Therefore, the Court will grant BBI judgment against the Debtor and Mrs. Montagne on Account # 205 for the principal amount of $27,315.89.

2.      Account # 203

The Debtor asserts the following defenses to liability on Account # 203: (1) BBI failed to prove delivery of goods; (2) BBI failed to prove price; (3) BBI failed to prove the amount due; (4) there are no Account # 203 invoices in evidence; and (5) the ledger cards contain mistakes.  Mrs. Montagne asserts the following additional defenses to liability on Account # 203: (1) the account was set up without her consent; (2) she made no specific promise to pay BBI; (3) the ledger cards fail to show delivery; and (4) BBI's dealings were with the Debtor and not her.

The Court first addresses the defenses Mrs. Montagne asserts on her behalf.  Mrs. Montagne asserts that BBI never obtained a promise to pay from her, and that BBI always dealt with the Debtor.  Mrs. Montagne also asserts that she cannot be held liable because she no longer has an ownership interest in the farm.  The Court finds none of these defenses to be persuasive or supported by the record.  The Debtor and Mrs. Montagne co-owned the home farm.  (Trial Tr. 79:9–80:14.)  This fact is shown not only by Mrs. Montagne's own testimony, but also by documents that Mrs. Montagne signed, including credit applications to Ag Venture Financial Services, Inc. ("Ag Venture"), which clearly identify her as co-owner of the farm.  (Diane Montagne's Exs. 10, 12, 16, 17.)  Mrs. Montagne handled the farm bills, paperwork, and finances, sometimes placed orders, and did occasional chores outside, all of which contributed to the financial success of the dairy farm operation.  (Trial Tr. 79:13–23, 93:17–24.)  There is no dispute that the Debtor, who had known Mr. Bourdeau since his youth, was the primary contact for business transactions with BBI.  (Trial Tr. 82:25–83:5.)  However, the record shows that Mrs. Montagne also interacted with BBI on occasion.

Due to marital difficulties, Mrs. Montagne and the Debtor executed an agreement in December 2006 regarding a division of farm and non-farm real property and assets, and Mrs. Montagne quitclaimed her interests in the farm real estate and farm assets in September 2007 (doc. #268 ¶¶ 52, 56).  BBI was not

a party to that December 2006 agreement.  Said agreement cannot compel a creditor to release either the Debtor or Mrs. Montagne from a debt on which they have joint liability (see doc. # 115).  Taking into account Mrs. Montagne's status as co-owner of the farm, the Montagnes' joint responsibilities on the farm, and the Debtor's longstanding relationship with Mr. Bourdeau, the Court finds that the fact that Mrs. Montagne was not the primary contact on behalf of the Montagnes with BBI is insufficient to eliminate her liability.

As BBI has established its prima facie case (see § IA, supra), the Debtor and Mrs. Montagne cannot rebut it based solely upon general denials as to the elements of the prima facie case.  See Levine, 36 A.2d at 657; see also Farlee Drug Center, Inc. v. Belle Meade Pharmacy, Inc., 464 So.2d 802, 806 (La. Ct. App. 1985) (noting that once the plaintiff has established its prima facie case, it is the defendant's burden to produce evidence rebutting the existence or correctness of the account).  In order to rebut BBI's prima facie case, the Montagnes must produce evidence to support their defenses with specificity, i.e., evidence showing that the account did not exist, that the amount due is incorrect, that specific charges are incorrect, or that prior payment was made.[9]

The Montagnes assert generally that BBI may not rely solely on the ledger cards to prove delivery, price, or amount due.  The Court finds that although the ledger cards alone do not prove those account details, they are relevant, material, and support BBI's prima facie case as to delivery, reasonableness of the charges, and the amount due.  See Gardner, 513 P.2d at 759 (finding that ledger cards showing date of purchase, invoice number, amount of invoice, payments and credits, and current state of account, in addition to other testimony, established the prima facie case, and that each individual item need not be specifically proved); see also Cardinal, 432 So.2d at 421 (finding that ledger cards are probative of delivery, since they bear the date of alleged delivery of goods, and that they are relevant and material, since they show pertinent and debits and credits).  Mr. Bourdeau testified that the ledger cards show charges, orders, payments, and a running total of the ultimate amount due.  (Trial Tr. 26:3–17.)  The ledger cards also show invoice numbers.  (Pl.'s Ex. 2.)  The ledger cards, along with BBI's credible testimony and other documentary evidence, are sufficient to establish delivery, price, and amount due.

---

[9] The Debtor points to specific mistakes in the ledger cards where BBI listed entries on the Account # 203 ledger cards for ten invoices showing deliveries to the Bourbeau farm, which should have been reflected on the Account # 204 ledger cards (see doc. # 370, p. 4, n.2).  In two instances, BBI made a "Bourbeau" notation on the Account # 203 ledger cards.  The Court has reviewed the ledger cards for Account ## 203 and 204, and it does not appear that the Montagnes were double-billed for any of those charges.  The Court does not find these minor mistakes to be sufficient to disturb BBI's prima facie case on Account # 203.

Therefore, the Court finds the Montagnes' defense with respect to the adequacy of BBI's proof in this regard to be without merit.

The Debtor and Mrs. Montagne assert as an additional defense that BBI failed to introduce into evidence any invoices from Account # 203. Although BBI did introduce and include one Account # 203 invoice showing receipt of payment on Account #203 (Pl.'s Ex. 5, Bour925), Mrs. Montagne is correct that BBI introduced no invoices showing goods delivered. Nevertheless, an absence of invoices is not fatal to BBI's ability to recover on its claim, as it is established that a plaintiff may prove an account by offering oral testimony. See Baumann, 289 N.E.2d at 378 (finding that plaintiff need not produce actual invoices to meet its burden of proof); Gardner, 513 P.2d at 759 (noting that no invoices were introduced into evidence, but finding actual ledger cards, in addition to testimony as to other elements of the claim, was sufficient to state a prima facie case); Kroger Co. v. United States Foodservice of Atlanta, Inc., 607 S.E.2d 177, 181–82 (Ga. Ct. App. 2004) (stating that a creditor is not required to produce actual invoices to meet its burden of proof). The absence of written records may have a bearing upon the weight given to oral testimony offered to establish an account. Baumann, 289 N.E.2d at 379. Certainly, BBI's case would be stronger if it had introduced as evidence invoices for goods delivered on Account # 203, similar to those introduced for Account ## 204 and 205, rather than just one showing receipt of payment. However, under these circumstances, where both parties had access to invoices, the Court will not draw an adverse inference from BBI's failure to produce the invoices. See Pacific Lumber, 108 Vt. at ¶¶ 10–11, 182 A. at 195 (noting that a negative inference may be drawn where evidence is only available to one party, but that the rule does not apply where evidence is equally available to both parties). Mr. Bourdeau and the Debtor both testified that Account # 203 was created as a result of the Debtor's negotiations with BBI, and the Debtor testified that Mrs. Montagne was present at the negotiation meeting. (Trial Tr. 29:17–30, 125:1–126:7.) Neither the Debtor nor Mrs. Montagne testified that they never received invoices for Account # 203. Rather, the Montagnes both testified that they sometimes received invoices for deliveries from BBI. (Trial Tr. 81:19–82:13, 124:11–15.) The Court finds that the Montagnes' defense based upon the absence of invoices is insufficient to support a determination that the Montagnes are not liable for the charges on Account # 203 or to rebut BBI's prima facie case as to Account # 203.

Alternatively, the Montagnes argue that they are entitled to a credit in the amount of $100,000 on Account # 203 based upon BBI's incorrect application of a $100,000 check. The check in question represented the proceeds of a loan from Ag Venture to the Montagnes. At trial, both Mr. Bourdeau and the Debtor testified regarding the application of the $100,000 payment. Mr. Bourdeau testified that BBI would never credit a payment that large without direction from the customer. (Trial Tr. 176:16–21.) Mr.

Bourdeau also testified that he clearly recalled a telephone conversation with the Debtor within a day or two of BBI receiving the check, during which conversation the Debtor instructed him to apply the funds to Account # 204.  (Trial Tr. 175:19–177:17.)  Mr. Bourdeau testified that it made no difference to BBI to which account the check was applied.  (Trial Tr. 178:2–6.)  Mr. Bourdeau also testified that he did not have a separate conversation with Mrs. Montange concerning how to apply the check.  (Trial Tr.  178:16–19.)  The Debtor initially testified that he did not speak to anyone from BBI concerning the application of any loan proceeds to Account # 204, (Trial Tr. 148:24–149:7), but later testified that he did not recall having a conversation with Mr. Bourdeau regarding the $100,000 check.  He also opined that if he had been asked to give such direction, he would have asked BBI to apply the payment to Account # 203.  (Trial Tr. 196:16–197:22.)  The Court finds Mr. Bourdeau's testimony that he spoke with the Debtor and applied the $100,000 to Account # 204 at the Debtor's direction to be credible and persuasive.

The Montagnes urge the Court to believe that they would never have directed any of their funds to be applied to Account # 204, which the Montagnes argue is the account held by MHI for the Bourbeau farm, based on their argument that they have no personal liability for MHI debts.  For the reasons explained more fully below, the Court finds that the Debtor and Mrs. Montange are personally liable on Account # 204.  Thus, BBI's application of the $100,000 check to Account # 204 did in fact reduce the Montagnes' overall liability to BBI.  As to Mrs. Montange's defense that she never gave consent regarding the application of the $100,000 check to Account # 204, the Court finds that the Debtor's directions to BBI bound both the Debtor and Mrs. Montange.  In light of the testimony at trial and the absence of any evidence showing a protest by the Montagnes contemporaneous with the invoice showing BBI's application of the $100,000 check to Account # 204, the Court finds that BBI applied the $100,000 check to Account # 204 at the Debtor's direction and that the application of funds was not improper.  Accordingly, the Court finds that the Montagnes have failed to rebut BBI's prima facie case as to Account # 203.

Therefore, the Court will grant BBI judgment against the Debtor and Mrs. Montange on Account # 203 for the principal amount of $568,442.33.

  3. Account # 204

The Debtor asserts the following defenses to liability on Account # 204: (1) he did not purchase goods on this account in his individual capacity; (2) he was not involved in ordering goods on this account; and (3) he never received documents relating to Account # 204.  The remaining relevant defense asserted by Mrs. Montange is that only MHI was liable Account # 204, and therefore she cannot be personally liable for sums due on the account.

The threshold issue for liability here is a determination of who the customer/obligor was on Account # 204.  The Montagnes claim that MHI was the sole customer/obligor on the account.  Mr. Bourdeau, while aware of the existence of MHI, testified he never had discussions with the Debtor or Mrs. Montagne regarding MHI, that BBI never had an account in the name of MHI, and that BBI never sent any invoices that showed as MHI as the customer.  (Trial Tr. 12:25–13:9, 13:18–14:10.)  The Debtor testified that, although invoices were not sent to MHI specifically, invoices for Account # 204 went to a different address, MHI paid those invoices, and MHI held its own checking account.  (Trial Tr. 132:22–133:3, 147:15–21.)

Upon consideration of the testimony and documentary evidence, the Court finds that MHI did not have an account with BBI, and that the Montagnes were the customers on Account # 204.  In reaching this determination, the Court is not piercing the corporate veil to impose liability on the Montagnes as the owners of MHI.  There is Vermont case law that squarely addresses the personal liability of an individual agent for the debts of a principal corporation.  The Vermont Supreme Court states that "an agent must disclose the fact of his agency and the identity of his principal if he is to escape personal liability."  Biron v. Abare, 147 Vt. 567, 568, 522 A.2d 230, 231 (Vt. 1987) (quoting Douglas v. O'Connell, 139 Vt. 427, 429, 429 A.2d 1310, 1311 (Vt. 1981)); see also A.G. Anderson Co., Inc. v. T.C. Indus., Inc., 135 Vt. 522, 523, 380 A.2d 90, 91 (Vt. 1977) (holding that persons acting in a capacity other than as principals must openly announce that fact in order to avoid liability).  In Biron, even where the purchasers picked up goods in a company vehicle, the court found that the use of a trade name did not conclusively prove agency on behalf of the corporation.  It also held that whether the presence of a business name on company trucks, creditor's designation of the company's name on the account, and payment by checks with the company name amounted to adequate notice of agency status was a factual question.  Biron, 147 Vt. at 568, 522 A.2d at 231.  A similar inquiry is posed here where BBI delivered goods to a farm operated by MHI.  The record reflects that although BBI was aware of the existence of MHI, BBI considered the Montagnes to be its customers for all goods sold and delivered to the Bourbeau farm on Account # 204.  This view is consistent with the ledger card designation and the face of the Account # 204 invoices, which list the Debtor's name and not MHI.  Further, no evidence was admitted at trial showing that Account # 204 was paid using checks from a separate MHI checking account.  Even if such evidence had been admitted, it would simply present another factual component for the Court to take into consideration as a circumstance of the parties' transactional relationship.  See Biron, 147 Vt. at 568, 522 A.2d at 231.

In another case highly germane to the case at bar, the Vermont Supreme Court analyzed a situation in which a husband and wife denied liability on an open account under the theory that it was their corporation that owed the debt.  See Diamond Nat'l Corp. v. Szerbik, 129 Vt. 452, 282 A.2d 806 (Vt. 1971).  In Diamond, the court considered the following facts to be persuasive in finding that the husband and wife were personally liable: (1) the plaintiff testified the account was set up in the defendants' names and upon their credit; (2) the plaintiff had a previous relationship and personal account with the defendants; (3) the defendants' invoices were sent in the husband's name; (4) the plaintiff mailed monthly statements to the defendants; (5) the defendants were aware that the goods were billed to them individually and never complained to the plaintiff that the billing was incorrect; (6) the plaintiff never had an account with the defendants' corporation; (7) no goods were ever returned to the plaintiff as having been billed to the wrong party; and (8) even though the corporation was formed at about the time that the account was opened, the corporation never made an application to the plaintiff for credit and the defendants never indicated that they had reason to believe such an application would have been approved. Diamond, 129 Vt. at 453–58, 282 A.2d at 808–11.

Many of the Diamond factors are present in the instant case.  BBI had a longstanding relationship with the Montagnes that began with Account # 205 over two decades ago, which account was unequivocally set up for the benefit of the Montagnes.  (Trial Tr. 25:15–16:19.)  During this business relationship, the Montagnes became valued customers and enjoyed many price and repayment concessions available to BBI's valued customers.  (Trial Tr. 28:15–29:25, 123:7–124:4, 145:16–146:6, 184:17–186:22.)  When the Montagnes purchased the Bourbeau farm, they established another account and BBI began making deliveries to that farm in December 2001.  (Pl.'s Exs. 3, 5.)  The Montagnes, and not MHI, owned the Bourbeau farm real estate.  (Trial Tr. 85:19–22.)  There is no testimony or evidence that MHI, which was formed in early 2002, ever submitted to BBI an application for credit (or to open an account).  The Montagnes proffered no testimony regarding any affirmative steps they took either to disclose that they were now acting as agents for MHI rather than on their own behalf or to request that MHI become the customer on Account # 204.  As noted above, Mr. Bourdeau testified that BBI never had an account in MHI's name, (Trial Tr. 12:25–13:9, 13:18–14:10), and the Account # 204 ledger cards and invoices in the record contain no mention of MHI.  There is likewise no evidence in the record that the Debtor ever complained about the designation of Account # 204 as being in his name.  The Montagnes received monthly statements and yearly reconciliations, and paid them for over two decades with only minor and infrequent complaints about the quantity or quality of deliveries.  (Trial Tr. 38:20–23, 89:18–20, 91:10–22, 142:14–143:13.)  There was no testimony at trial that the Montagnes ever returned any

goods because they were billed to the Debtor personally and not to MHI.  Thus, the Court finds that the record solidly supports BBI's contention that the Montagnes were the customers on Account # 204, and that MHI was not.  Upon consideration of the Montagnes' arguments, the Court finds that the Montagnes have failed to rebut BBI's prima facie case as to Account # 204.

Therefore, the Court will grant BBI judgment against the Debtor and Mrs. Montagne on Account # 204 for the principal amount of $73,160.60 due on Account # 204.

## II.     BBI is Entitled to Recovery of Interest on Open Accounts

Having found that BBI is entitled to judgment on the principal amounts due on Account ## 203, 204, and 205, the Court now turns to the issue of whether BBI is entitled to collect interest on the account balances, and if so, at what interest rate.  There are two legal bases upon which BBI may have the right to collect interest.  First, contracting parties may agree to terms on interest, either through express agreement or by operation of the applicable provisions of the Vermont Uniform Commercial Code ("UCC").  Second, interest may be collected under certain circumstances pursuant to common law principles.

The UCC provides that, as between merchants, additional terms to a contract become part of the contract unless "(a) the offer expressly limits acceptance to the terms of the offer; (b) they materially alter it; or (c) notification of objection to them has already been given or is given within a reasonable time after notice of them is received."  9A V.S.A. § 2-207(2); see also Coosemans Specialties, Inc. v. Gargiulo, 485 F.3d 701, 708 (2d Cir. 2007) (analyzing New York's identical version of section 2-207 and finding liability for attorney's fees based on provision printed on an invoice); Traveler's Ins. v. DeMarle, No. 826-99 Cncv (Katz, J., Sept. 22, 2003) (noting that warranty disclaimers are disfavored by law and citing UCC § 2-207 to support a finding that a warranty disclaimer on an invoice would have a material effect on the contract rights of its customer).  The UCC further provides that an example of an additional term that "involve[s] no element of unreasonable surprise and which therefore [is] to be incorporated in the contract unless notice of objection is seasonably given [is] . . . a clause providing for interest on overdue invoices or fixing the seller's standard credit terms where they are within the range of trade practice and do not limit any credit bargained for . . .."  9A V.S.A. § 2-207, cmt. 5; see also Vulcan Auto. Equip., Ltd. v. Global marine Engine & Parts, Inc., 240 F.Supp.2d 156, 161–63 (D. R.I. 2003) (analyzing Rhode Island's identical version of section 2-207 and finding that pre-printed terms regarding interest are incorporated into the parties' contract absent notice of objection); In re Delyser, 295 B.R. 430, 436 (Bankr. W.D.N.Y. 2003) (finding that where a defendant received invoices containing interest terms, there existed an affirmative duty to object to those terms, and in the absence of such an objection those terms became part of the contract).

The UCC also provides that the terms of an agreement may be "explained or supplemented: (a) by course of performance, course of dealing, or usage of trade (§ 1-303 of this title); and (b) by evidence of consistent additional terms . . .." 9A V.S.A. § 2-202. Section 1-303 of the UCC provides that

> [a] 'course of performance' is a sequence of conduct between the parties to a particular transaction that exists if:
>> (1) the agreement of the parties with respect to the transaction involves repeated occasions for performance by a party; and
>> (2) the other party, with knowledge of the nature of the performance and opportunity for objection to it, accepts the performance or acquiesces in it without objection.

9A V.S.A. § 1-303(a); see also Weale v. Lund, 162 Vt. 622, 624, 649 A.2d 247, 250 (Vt. 1994) (citing the predecessor to section 1-303 and finding that the defendants' conduct amount to acquiescence to the plaintiff's course of performance, and considering invoices to be relevant to explain or supplement a vague interest provision in a credit agreement); Vogel v. W.A. Sandri, Inc., 898 F.Supp. 254, 257 (D. Vt. 1995) (citing the predecessor to section 1-303 and finding that the parties' actions over many years demonstrated an understanding as to performance under a requirements contract).[10]

There are also Vermont common law principles that address the circumstances under which a seller may impose and collect interest on past due accounts, and provide that a contract and its terms may be implied from the facts surrounding the transaction. Cushman v. Outwater, 121 Vt. 426, 429, 159 A.2d 89, 91 (Vt. 1960). The Vermont Supreme Court has found that

> [i]nterest is compensation paid for the use of money, and generally by debtor to creditor in recompense for detention of debt. In the absence of a contract concerning it, interest does not begin to run until a debt is shown to be in default. And the debt is not considered in default until payment is demanded or until suit is brought, which is a judicial demand.

---

[10] The Debtor argues that this Court would be overruling the Vermont Supreme Court if it were to rely upon the UCC in its analysis of the legal issues presented in the instant case. In support of that position, the Debtor points to a case in which the Vermont Supreme Court denied a claim for interest based upon pre-printed terms contained on invoices and stated that "[g]enerally, tallies or receipts are not contracts and therefore do not stand as the exclusive evidence of the parties' intentions." Agway, Inc. v. Brooks, 173 Vt. 259, 265, 790 A.2d 438, 443 (Vt. 2001) (citing Drown's Guardian v. Chesley's Estate, 92 Vt. 19, 23, 102 A. 102, 103 (Vt. 1917)) (emphasis added). The Debtor's argument fails for two reasons. First, the court in Agway, citing a decision that pre-dates the enactment of the UCC in Vermont, stated merely that invoices generally are not exclusive evidence of the parties' intentions. Even if this Court were to view this statement as an implicit rejection of section 2-207, given the "exclusive evidence" qualification in Agway and the clear language of UCC sections 2-202 and 1-303, this Court will consider the parties' course of performance, along with the invoices, to ascertain the parties' intentions. Second, the court in Agway made no reference to the UCC provisions and gave provided no indication whether the plaintiff raised a question as to the applicability of the UCC provisions. Since the Vermont Supreme Court neither addressed nor rejected the UCC provisions in its analysis in Agway, this Court will analyze the commercial transactions at issue in light of the applicable provisions of the UCC as well as the guidance of Vermont jurisprudence.

Vermont Structural Steel Corp. v. Brickman, 131 Vt. 144, 147, 300 A.2d 629, 631 (Vt. 1973) (citations omitted). Interest is to be paid from the time that the debt becomes payable. Id. (citing Vermont & Canada R. Co. v. Vermont Cent. R. Co., 34 Vt. 1, 4 (Vt. 1861)). Where there is no evidence of the date that the debt became payable or of a demand, "interest is to run from the date suit was brought." Id.

BBI relies upon the parties' course of dealing, invoices, and ledger cards as evidence of an agreement between BBI and the Montagnes for BBI to collect interest on overdue charges on Account ## 203, 204, and 205. BBI's pre-printed invoices contained a clear and conspicuous clause stating that a periodic rate of "1½ % per month (18% annual percentage rate) will be applied to any past due balance which was billed 30 days or more prior to the closing date of this statement."[11] (Pl.'s Exs. 5, 6.) BBI introduced into evidence ledger cards for Account ## 203, 204, and 205, as well as invoices for goods delivered on Account ## 204 and 205. (Pl.'s Ex. 5.) On the other hand, the testimony and other evidence show that BBI and the Debtor had a practice of negotiating the interest rates due on the accounts. (Trial Tr. 28:15–29:1; Pl.'s Exs. 1, 4.)[12] John Whitney, BBI's credit manager from 1987 through 2001 ("Mr. Whitney"), testified that BBI customarily charged 1½ % per month on past due accounts, but that Mr. Bourdeau would often make surprising concessions to certain highly valued customers who were struggling financially. (Trial Tr. 186:1–17.) Testimony by Mr. Bourdeau and the Debtor regarding Account # 205 corroborated Mr. Whitney's testimony about interest being negotiable at BBI. (Trial Tr. 28:1–29:25, 125:1–127:12.) With this general backdrop, the Court will examine BBI's right to collect interest on each account, beginning with Account ## 205 and 204, for which the record contains invoices, before turning to Account # 203 and the Fertilizer Account.[13]

### A.    Account # 205

BBI produced a number of invoices for Account # 205, which contain the standard, pre-printed 18% annual interest term. (Pl.'s Ex. 5.) In determining whether BBI is entitled to collect interest on Account # 205, the Court must initially determine whether the Montagnes are "merchants" for purposes of

---

[11] The Court notes that, although the same clause also contains a term providing that the "customer will be responsible for reasonable attorney fees and costs if collection of this amount becomes necessary," BBI has stated that attorney's fees are not included in its claim (doc. # 363, p. 3, n.5).

[12] The ledger cards submitted in support of BBI's claim on the Fertilizer Account include a notation of an interest rate of 12% typed over or under the standard interest rate language providing for 18%. (Pl.'s Ex. 1.) However, an invoice for the Fertilizer Account was also introduced into evidence to show that the Debtor was aware that the interest rate on the Fertilizer Account was 18%. (Trial Tr. 22:1–10; Pl.'s Ex. 6.)

[13] BBI made no specific request for pre-judgment, post-petition interest. If, after the conclusion of the Ag Venture trial (AP # 08-1022 and # 08-1023), BBI is found to be oversecured under 11 U.S.C. §506(b), the Court will address BBI's rights, if any, to post-petition interest upon BBI's motion.

analyzing the applicability of certain UCC provisions.  The Court concludes that they are because the Vermont Supreme Court has declared dairy farmers to be merchants.  See Aube v. O'Brien, 140 Vt. 1, 4, 433 A.2d 298, 300 (Vt. 1981).  The UCC defines a merchant as "a person who deals in goods of the kind or otherwise by his occupation holds himself out as having knowledge or skill peculiar to the practices or goods involved in the transaction or to whom such knowledge or skill may be attributed by his employment of an agent or broker or other intermediary who by his occupation holds himself out as having such knowledge or skill."  9A V.S.A. §2-104(1).  A dairy farmer is a merchant in all aspects of his mercantile capacity, i.e., with respect to goods for dairy farming operations, but not for every purchase of goods.  See 9A V.S.A. §2-104, cmt. 2 ("But even these sections only apply to a merchant in his mercantile capacity; a lawyer or bank president buying fishing tackle for his own use is not a merchant").  The Court is satisfied that the Montagnes, as dairy farmers, are merchants for purposes of the UCC, with respect to the purchase of goods in connection with the operation of their dairy farm.

Since the Montagnes are merchants for purposes of the UCC, the interest rate term printed on the BBI invoices became part of the contract between BBI and the Montagnes unless the record shows that (1) the Montagnes notified BBI that they objected to the imposition of interest on their accounts; and (2) the interest term is material to the contract.  See 9A V.S.A. §2-207.  There is no evidence in the record that the Montagnes objected to the interest charged on Account # 205.  Moreover, despite the Debtor's argument to the contrary, an invoice term such as the one here is not a material term.  See 9A V.S.A. §2-207(2)(b), cmt. 5 (noting that a clause providing interest on overdue invoices involves no element of unreasonable surprise and should therefore be incorporated into a contract absent notice of objection); see also Vulcan, 240 F.Supp.2d at 161 (concluding that the commentary to section 2-207 encourages the incorporation of interest in such a situation).  Thus, the Court finds that, by operation of section 2-207, the interest terms contained on the invoices for Account # 205 became part of the parties' contract and are enforceable against the Montagnes.

Importantly, the record establishes that BBI and the Debtor negotiated a change of interest rate on May 31, 2004, reducing the interest rate on Account # 205 from 18% to 9%.  (Trial Tr. 28:1–29:25, 125:1–127:12; Pl.'s Exs. 2, 4, 5.)  Therefore, BBI has established that it had a contract with the Montagnes for interest on Account # 205 at a rate of 18% from its inception until May 30, 2004, and that the interest rate on Account # 205 was reduced to 9% on May 31, 2004.  Guided by the principles of the UCC and Vermont common law, the Court finds that BBI is entitled to interest, at these rates, on the outstanding balance of Account # 205.

Accordingly, the Court will grant BBI judgment against the Debtor in the principal amount of $27,315.89, plus interest at the rate of 18% per annum from the inception of Account # 205 until May 30, 2004, and at the rate of 9% per annum from May 31, 2004, through the date the Debtor filed his bankruptcy petition in this case. The Court will grant BBI judgment against Mrs. Montagne in the principal amount of $27,315.89, plus interest at the rate of 18% per annum from the inception of Account # 205 until May 30, 2004, and at the rate of 9% per annum from May 31, 2004, through the date of the entry of judgment.

### B.      Account # 204

BBI produced a number of invoices for Account # 204, all of which contain the standard, pre-printed 18% annual interest term. (Pl.'s Ex. 5.) Unlike Account # 205, the record contains no specific testimony from either Mr. Bourdeau or the Montagnes regarding the specific interest rate associated with Account # 204. Nevertheless, there is no evidence in the record that the Montagnes, prior to the initiation of this litigation, ever objected to the interest rate term on the invoices for Account # 204, disputed a bill based upon the interest charged, or refused to pay interest. As discussed above (see § IIA, supra), the interest term became part of the parties' contract pursuant to the UCC. Thus, by admission of the invoices, as well as the testimony concerning the invoices and the long course of conduct between the parties, BBI has established that it had a contract with the Montagnes for interest on Account # 204 at a rate of 18% per annum. Therefore, the Court finds that BBI is entitled to collect interest at 18% per annum on the outstanding balance of Account # 204.

Accordingly, the Court will grant BBI judgment against the Debtor in the principal amount of $73,160.60, plus interest at the rate of 18% per annum from the inception of Account # 204 through the date the Debtor filed his bankruptcy petition in this case. The Court will grant BBI judgment against Mrs. Montagne in the principal amount of $73,160.60, plus interest at the rate of 18% per annum from the inception of Account # 204 through the date of entry of judgment.

### C.      Account # 203

BBI introduced one invoice for Account # 203 showing only the crediting of a receipt of payment, but since it introduced no invoices for goods delivered, it has no right to collect interest under section 2-207 of the UCC. Rather, BBI is only entitled to collect interest if such a right is found under Vermont common law principles.[14] Mr. Bourdeau testified to the balance due on Account # 203 and the associated

---

[14] In the absence of an express agreement, Vermont statutes may also provide a basis for charging interest from the date of suit. See Brickman, 131 Vt. at 147, 300 A.2d at 631.73). "Prejudgment interest is awarded as of right when damages are liquidated or reasonably certain . . .. In those cases where the amount of damages is uncertain or disputed, the trial court may award prejudgment interest in a discretionary capacity." EBWS, LLC v. Britly Corp., 2007 VT 37, ¶ 36, 181 Vt. 513, 526, 928 A.2d

interest rate at 18% on Account # 203.  (Trial Tr. 30:4–31:8.)  The Debtor testified regarding the creation of Account # 203 for the purpose of receiving goods at a price discount.  (Trial Tr. 125:3–126:17, 145:4–146:6.)  The Debtor never specifically disputed the testimony regarding principal and interest, except to say that he was generally unaware of the interest rate charged on the accounts with BBI.  (Trial Tr. 143:22–144:22.)  Given this testimony, as well as the relationship established between the parties with respect to the other accounts, the Court finds it proper to conclude that an obligation to pay interest may be implied.  See 47 C.J.S. Interest & Usury § 30.

The general rule is that interest is to be paid from the time a debt becomes payable.  See Brickman, 131 Vt. at 147, 300 A.2d at 631.  As to open accounts, the long-settled law in Vermont is that "in the absence of any agreement express or implied, ordinary running accounts fall due annually, and like other debts, bear interest after falling due, unless otherwise provided by agreement express or implied." Tudor v. Tudor's Estate, 93 Vt. 353, 355, 107 A. 132, 133 (Vt. 1919).  Mr. Bourdeau testified that BBI sent monthly statements and yearly reconciliations.  (Trial Tr. 38:20–23.)  Although BBI did not produce these documents at trial, this is not fatal to BBI's claim because Mrs. Montagne, who handled the farm finances, paperwork, and billing, acknowledged receipt of the BBI monthly statements.  (Trial Tr. 89:18–20.)  In light of the undisputed fact that BBI sent the Montagnes monthly statements, as well as the thirty-day term associated with Account ## 204 and 205, the Court finds that the Montagnes' debt to BBI on Account # 203 became payable monthly.  Regarding the question of what interest rate to apply to Account # 203, the Court gives significant weight to the parties' practice of negotiating interest rates, e.g., the rate reductions on Account # 205 and the Fertilizer Account, since there are no Account # 203 invoices for sale of goods in the record.  Given the parties' history of interest rate negotiations and the Debtor's uncertainty as to the rate of interest on the accounts, the Court will not grant BBI's request for interest on Account # 203 at the rate of 18% per annum.  To determine the proper interest rate, the Court relies upon Vermont's statutory rate for prejudgment interest, which the Court finds that the Vermont legislature has deemed most fair, and that the Vermont courts have applied as a reasonable interest rate.  Vermont's

---

497, 509 (Vt. 2007) (citations omitted); see also Remes v. Nordic Group, Inc., 169 Vt. 37, 39, 726 A.2d 77, 79 (Vt. 1999) (acknowledging the court's discretion to award prejudgment interest).  Prejudgment interest is awarded at a rate of 12% per annum.  9 V.S.A. § 41a(a).  Vermont Rule of Civil Procedure 54, which governs prejudgment interest awards, "does not require that the amounts be precisely or infallibly ascertainable, only that they be reasonably so." Smedberg v. Detlef's Custodial Serv., Inc., 2007 VT 99, ¶¶ 35, 38, 182 Vt. 349, 365–66, 940 A.2d 674, 685 (Vt. 2007).  Otherwise, "defendants would always be able to unilaterally defeat an award of prejudgment interest simply by presenting a conflicting theory of damages." Id. at ¶ 39, 182 Vt. at 366, 940 A.2d at 686 (quotation and citation omitted).  However, since the Court finds that BBI is entitled to collect interest pursuant to common law principles, the Court need not address BBI's rights, if any, to statutory prejudgment interest from the date of suit.

statutory rate for prejudgment interest is 12% per annum.  See 9 V.S.A. § 41a(a).  Therefore, BBI is

entitled to interest at the statutory rate of 12 % per annum on the outstanding balance of Account # 203.

Accordingly, the Court will grant BBI judgment against the Debtor in the principal amount of

$568,442.33, plus interest at the rate of 12% per annum from the inception of Account # 203 through the

date the Debtor filed his bankruptcy petition in this case.  The Court will grant BBI judgment against Mrs.

Montagne in the principal amount of $568,442.33, plus interest at the rate of 12% per annum from the

inception of Account # 203 through the date of entry of judgment.

### D.      Fertilizer Account

As noted above, the Montagnes stipulated at trial as to the principal and pre-judgment interest

amount due on the Fertilizer Account, and account associated with Account ## 203 and 205, while

reserving an objection to any post-petition interest on that account (Trial Tr., 18–19), and BBI has made

no specific request for pre-judgment, post-petition interest.  Accordingly, the Court will grant BBI

judgment against the Debtor and Mrs. Montagne in the principal amount of $78,630.56 (inclusive of

principal and interest), as the parties have agreed by stipulation.  (Trial Tr. 18:16–20:25.)

### III.      BBI's Unjust Enrichment Claim is Moot

In the alternative, BBI seeks to recover on a theory of unjust enrichment.  Under the doctrine of

pleading in the alternative,

> a party is allowed to plead breach of contract, or if the court finds no contract was
> formed, to plead for quasi-contractual relief in the alternative.  Once a valid contract is
> found to exist, quasicontractual relief is no longer available.

Cromeens, Holloman, Siber, Inc. v. AB Volvo, 349 F.3d 376, 397 (7th Cir. 2003).  The Court found

above that BBI is entitled to judgment in its favor against the Montagnes on its contract-based suit for

recovery on the four open accounts (see §§ I and II, supra).  Accordingly, BBI's unjust enrichment claim

is denied as moot as to all accounts.

### IV.      The Objections to Claim # 23 are Overruled

On May 7, 2009, the Debtor filed an answer to BBI's second amended complaint that included as

a counterclaim an objection to BBI's Claim # 23 (doc. # 270).  On January 16, 2010, the Trustee filed an

objection to Claim # 23 seeking disallowance of BBI's claim on the basis that BBI violated the Vermont

Consumer Fraud Act, 9 V.S.A. § 2451 et seq. ("CFA"), or alternatively seeking equitable subordination of

BBI's claim (# 08-10916, doc. # 175).[15]

---

[15] To the extent that the Debtor has adopted the Trustee's arguments in objection to BBI's claim, any discussion and resolution of the Trustee's arguments apply equally to the Debtor.  To the extent that the Debtor bases his objection to claim on his own defenses or those of Diane Montagne, the Court has addressed those arguments above (see § IB, supra).

The Trustee first argues that BBI engaged in three unfair and deceptive trade acts or practices in violation of the CFA by seeking to: (1) collect on accounts based on the mischaracterizations of the nature of the account or the amounts claimed owed; (2) recover attorney's fees without a legal basis; and (3) recover interest in improper amounts or for unjustified reasons (# 08-10916, doc. # 175, ¶¶ 30–33).

The CFA provides, in pertinent part, that "unfair or deceptive acts or practices in commerce . . . are hereby declared unlawful." 9 V.S.A. § 2453(a). Three elements are required to establish a deceptive act or practice under the CFA:

(1)    there must be a representation, omission, or practice likely to mislead consumers;
(2)    the consumer must be interpreting the message reasonably under the circumstances; and
(3)    the misleading effects must be material, that is, likely to affect the consumer's conduct or decision regarding the product.

Carter v. Gugliuzzi, 168 Vt. 48, 56, 716 A.2d 17, 23 (Vt. 1998) (citing Peabody v. P.J.'s Auto Village, Inc., 153 Vt. 55, 57, 569 A.2d 460, 462 (Vt. 1989)). Factors to consider in determining whether an act or practice is unfair include:

(1)    whether the practice, without necessarily having been considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise – whether, in other words, it is within at least the penumbra of some common-law, statutory, or other established concept of unfairness;
(2)    whether it is immoral, unethical, oppressive or unscrupulous; [and]
(3)    whether it causes substantial injury to consumers.

Christie v. Dalmig, Inc., 136 Vt. 597, 601, 396 A.2d 1385, 1388 (Vt. 1979) (quotation and citations omitted).

The Trustee bears the burden of establishing that BBI violated the CFA. See Vastano v. Killington Valley Real Estate, 2007 VT 33, ¶ 8, 182 Vt. 550, 551, 929 A.2d 720, 722 (Vt. 2007). The Trustee has not pointed to, and the Court has not found, any testimony presented at trial establishing the elements necessary for the Trustee to succeed on its argument, much less any place in the record supporting the Trustee's contention that the "evidence on the violations is uncontroverted" or that "BBI concedes it engaged in practices that violated the [CFA]" (# 08-10916, doc. # 187, p. 7; doc. # 192, p. 4).

The Trustee argues that BBI's debt collection actions violated the CFA (# 08-10916, doc. # 187, p. 7). However, the Court found above that BBI is entitled to recover the amounts owed under the four open accounts (see § I, supra). The Trustee also argues that BBI mischaracterized the debt in seeking to obtain an ex parte writ of attachment in state court. However, this Court previously denied a motion by the Debtor seeking to dissolve the ex parte writ of attachment because, inter alia, "it was issued on an asserted 'evidentiary' basis that has since been vitiated by sworn testimony and other evidence" (doc. # 225, p. 2).

The Court rejected this argument and declined to reconsider the state court's order (doc. # 225, pp. 5–6), and the Court will not do so now.  See United Student Aid Funds, Inc. v. Espinosa, 130 S.Ct. 1367 (2010).  The Trustee further argues that the misapplication of a $100,000 payment to Account # 204 instead of Account # 203 was a violation of the CFA (# 08-10916, doc. # 187, p. 8).  However, the Court found above that the $100,000 payment was proper (see § IB, supra).  The Trustee also argues that BBI violated the CFA by misapplying interest (# 08-10916, doc. # 192, p. 4).  BBI's proof of claim indicates that interest was due in the amounts of 9%, 12%, and 18% per annum on the various open accounts (Claim # 23).  In its second amended complaint, BBI sought interest on the open accounts, including specifically 18% on Account ## 203 and 204 (doc. # 263, ¶¶ 12, 18).  The Court found above that BBI is entitled to interest on Account # 205 at the rate of 18% per annum through May 30, 2004, and then at the rate of 9%, on Account # 204 at the rate of 18% per annum, and on Account # 203 at the rate of 12% per annum (see § II, supra).  The Court did not grant BBI its requested interest rate of 18% on Account # 203 because of a lack of invoices in the record, as well as the parties' history of interest rate negotiations and the Debtor's uncertainty as to the rate of interest on the accounts (see § IIC, supra), but there is no evidence on the record suggesting that the 18% interest rate sought by BBI was de facto improper. Finally, the Trustee argues that BBI violated the CFA by seeking unwarranted attorney's fees (# 08-10916, doc. # 192, p. 4).  However, BBI has stated that attorney's fees are not included in its claim (doc. # 363, p. 3, n.5), and this is confirmed by the content of Claim # 23.

The Trustee has not met his burden of proof with respect to its allegation that BBI violated the CFA.  Thus, the Trustee's objection to Claim # 23 is overruled.

Alternatively, the Trustee argues that BBI's claim should be equitably subordinated on the basis that BBI engaged in inequitable conduct and exercised an unfair advantage in business relations with the Debtor to the detriment of the Debtor and the unsecured creditors by: (1) extending a commercially unreasonable amount of credit to the Debtor; (2) receiving confidential information from Ag Venture regarding proposed refinancing with the Debtor; (3) obtaining an ex parte attachment by providing false, incomplete, and misleading information to the state court; and (4) improperly seeking payment on the open accounts, including improper payment of attorney's fees and interest (see # 08-10916, doc. # 175, ¶¶ 35–39).

The Bankruptcy Code provides, in relevant part, that

(c)     Notwithstanding subsections (a) and (b) of this section, after notice and a hearing, the court may—

(1)     under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed

claim or all or part of an allowed interest to all or part of another allowed
interest; or

(2)     order that any lien securing such a subordinated claim be transferred to the
estate.

11 U.S.C. § 510(c).  As this Court previously held in this adversary proceeding,

[t]he concept of equitable subordination, as developed by case law, is that a claim may
normally be subordinated only if its holder is guilty of some misconduct.  It is a remedial,
not a penal, measure that is used only sparingly.  It arises in equity to prevent fraud or
injustice and usually arises when (1) the paying party has a liability, claim or fiduciary
relationship with the debtor; (2) the party pays to fulfill a legal duty or because of public
policy; (3) the paying party is a secondary debtor; (4) the paying party is a surety; or (5)
the party pays to protect its own rights or property . . . invok[ing] this relief against [a
creditor] solely to punish it for its alleged misconduct . . . is not a proper use of equitable
subordination.

In re Montagne, 2009 Bankr. LEXIS 1074, *8–10, 2009 WL 1065427, *2–3 (Bankr. D. Vt. Mar. 26,

2009) (quotations and citations omitted).

The Trustee also bears the burden of proof to establish that equitable subordination is warranted.

See In re Kelton Motors, Inc., 121 B.R. 166, 190 (Bankr. D. Vt. 1990).  The Trustee has not pointed to,

and the Court has not found, sufficient testimony presented at trial to establish the elements necessary for

the Trustee to succeed on this argument.

Regarding the Trustee's allegations that BBI's claim should be equitably subordinated because it

improperly obtained an ex parte writ of attachment and improperly sought payment on the open accounts,

the Court declined in above to reconsider the state court's final order granting BBI an ex parte writ of

attachment, and found that BBI did not improperly seek payment, including attorney's fees and interest,

on the open accounts.  Further, regarding the Trustee's allegation that BBI extended a commercially

unreasonable amount of credit to the Debtor, this Court previously denied an equitable subordination

claim raised by the Debtor in this adversary proceeding on this basis, finding that

[t]he Debtor cannot make a credible argument that it was to BBI's advantage to advance
him many thousands of dollars to permit his farming operation to continue, even as the
BBI debt became greater and the Debtor became less solvent.  This merely increased the
risk that BBI would not be paid.

In re Montagne, 2010 Bankr. LEXIS , *42, 2010 WL 271347, * 14 (Bankr. D. Vt. Jan. 22, 2010).  The

Court finds the Trustee's argument here to be similarly unpersuasive.

Lastly, the Trustee argues that BBI improperly received "confidential information" from Ag

Venture concerning an anticipated refinancing (including information that the refinancing would not

occur, information that the Debtor was threatening to assert claims against Ag Venture, and a list of the

Debtor's equipment given to Ag Venture in connection with the refinancing), that Germaine Bourdeau,

24

Mr. Bourdeau's brother and co-owner of BBI, was improperly engaged by Ag Venture to ascertain the value of the Debtor's equipment, and that BBI's alleged misconduct resulted in injury to the unsecured creditors (# 08-10916, doc. # 187, pp. 2–5; doc. # 192, pp. 2–3). However, the only evidence in the record concerning the confidentiality of the information in question undermines the Trustee's argument. The Debtor testified at trial that he told Mr. Bourdeau on multiple occasions that he was attempting to obtain the refinancing. (Trial Tr. 133:12–16.) The Debtor also testified that he requested that Mr. Bourdeau speak to Thomas Bellavance, president of Ag Venture, in order for Mr. Bourdeau to put pressure on Mr. Bellavance to expedite the refinancing. (Trial Tr. 136:10–18.) There is no evidence in the record establishing that the status of the refinancing was confidential, that BBI obtained it improperly, or that the Debtor did not share the information with others, including other creditors.

The Trustee has not met his burden of proof on his allegation that BBI's claim should be equitably subordinated. Thus, the Trustee's objection to Claim # 23 on this basis is overruled.

Accordingly, the objections to Claim # 23 are overruled, and BBI's claim shall be allowed in an amount consistent with this memorandum of decision.

## V.   **The Motion to Dismiss is Moot**

At the close of BBI's case in chief, the Montagnes moved orally to dismiss BBI's second amended complaint and reserved their right to file supporting briefs, but proceeded to call witnesses and put on a defense. On March 8, 2010, the Montagnes filed post-trial motions to dismiss (doc. ## 358, 359). Oral arguments were held on March 23, 2010, at which time the Debtor withdrew his motion, leaving only Mrs. Montagne's motion before the Court. Federal Rule of Civil Procedure 52(c), as made applicable by Federal Rule of Bankruptcy Procedure 7052, provides:

> Judgment on Partial Findings: If a party has been fully heard on an issue during a nonjury trial and the court finds against the party on that issue, the court may enter judgment against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue. The court may, however, decline to render any judgment until the close of the evidence. A judgment on partial findings must be supported by findings of fact and conclusions of law as required by Rule 52(a).

Fed. R. Civ. P. 52(c). Here, each party presented its case and the non-jury trial proceeded to the close of evidence. The Court's task at this juncture "is to weigh the evidence, resolve any conflicts in it, and decide for itself in which party's favor the preponderance of the evidence lies. Since it is serving as the trier of fact, the court even may assess the credibility of the witnesses." 9C Fed. Prac. & Proc. Civ. § 2573 (3d ed. 2010). The Court found above, based upon the evidence presented at trial, that BBI is entitled to judgment in its favor against both Michael Montagne and Diane Montagne (see §§ I and II,

supra).  A separate decision on Mrs. Montagne's motion to dismiss is unnecessary and would be
duplicative.  Accordingly, Mrs. Montagne's motion to dismiss is denied as moot.

CONCLUSION

For the reasons set forth above, the Court will grant BBI judgment against Michael Montagne and
Diane Montagne on BBI's claim for recovery on the four open accounts, will deny BBI judgment against
MHI, will deny BBI judgment on its claim for unjust enrichment, will overrule the objections to Claim #
23, and will deny Diane Montagne's motion to dismiss.

The Court will grant BBI judgment against Michael Montagne and Diane Montagne on BBI's
claim for recovery on the four open accounts, for which amounts due Michael Montagne and Diane
Montagne shall be held jointly and severally liable.

The Court will grant BBI judgment against Michael Montagne in the principal amount of
$27,315.89, plus interest at the rate of 18% per annum from the inception of Account # 205 until May 30,
2004, and at the rate of 9% per annum from May 31, 2004, through the date that Michael Montagne filed
his bankruptcy petition in this case.  The Court will grant BBI judgment against Diane Montagne in the
principal amount of $27,315.89, plus interest at the rate of 18% per annum from the inception of Account
# 205 until May 30, 2004, and at the rate of 9% per annum from May 31, 2004, through the date of the
entry of judgment.

The Court will grant BBI judgment against Michael Montagne in the principal amount of
$73,160.60, plus interest at the rate of 18% per annum from the inception of Account # 204 through the
date that Michael Montagne filed his bankruptcy petition in this case.  The Court will grant BBI judgment
against Diane Montagne in the principal amount of $73,160.60, plus interest at the rate of 18% per annum
from the inception of Account # 204 through the date of entry of judgment.

The Court will grant BBI judgment against Michael Montagne in the principal amount of
$568,442.33, plus interest at the rate of 12% per annum from the inception of Account # 203 through the
date that Michael Montagne filed his bankruptcy petition in this case.  The Court will grant BBI judgment
against Diane Montagne in the principal amount of $568,442.33, plus interest at the rate of 12% per
annum from the inception of Account # 203 through the date of entry of judgment.

The Court will grant BBI judgment against Michael Montagne and Diane Montagne in the
principal amount of $78,630.56 (inclusive of principal and interest) due on the Fertilizer Account, as the
parties have agreed by stipulation.

The Court will deny BBI judgment against MHI.

The Court will deny BBI judgment on its claim for unjust enrichment.

The Court will overrule the Trustee and Michael Montagne's objections to Claim # 23, and BBI's Claim # 23 shall be allowed in an amount consistent with this memorandum of decision.

The Court will deny Diane Montagne's motion to dismiss.

The Court has considered all of the arguments of the parties, and to the extent any argument is not specifically addressed herein it is because the Court has found it to be without merit.

This memorandum of decision constitutes the Court's findings of fact and conclusions of law.[16]


May 24, 2010                                                    Colleen A. Brown
Burlington, Vermont                                            United States Bankruptcy Judge

---

[16] On May 21, 2010, the Court issued a bench ruling setting forth the above conclusions of law.  To the extent that there are any inconsistencies between that bench ruling and this memorandum of decision, the memorandum of decision shall control.